**RICHARD R. BEST**
**REGIONAL DIRECTOR**
Lara S. Mehraban
Celeste A. Chase
Todd D. Brody
Derek M. Schoenmann
Ibrahim Sajalieu Bah
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Brookfield Place**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0080 (Brody)**
brodyt@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>             **Plaintiff,**<br><br>    **-against-**<br><br>**ERIC C. MALLEY and**<br>**MG CAPITAL MANAGEMENT LP,**<br><br>          **Defendants, and**<br><br>**MG GP III LP, and**<br>**MG CAPITAL REALTY MANAGEMENT LLC,**<br><br>         **Relief Defendants.** | **COMPLAINT**<br><br>21 Civ. 237 (    )<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants Eric C. Malley ("Malley) and MG Capital Management LP ("MG Capital") (collectively,

"Defendants") and Relief Defendants MG GP III LP ("MG GP") and MG Capital Realty

Management LLC ("MGC Realty") (collectively "Relief Defendants"), alleges as follows:

**SUMMARY**

1.      This case concerns an offering fraud orchestrated by Malley, the founder and

principal of MG Capital, the investment manager of two real estate funds.

2.      Malley fraudulently solicited investments in the two funds, MG Capital Management

Residential Fund III LP ("Fund III") and MG Capital Management Residential Fund IV LP ("Fund

IV") (collectively, the "MG Funds"), through deceptions ranging from fabricating a highly profitable

investment track record, to promising investors that their capital was "100% protected from loss"

and secured by a non-existent $250 million balance sheet, and to falsely claiming that MG Capital

had partnerships with hundreds of corporate tenants with pre-signed, multi-year lease agreements.

3.      After luring investors into the funds with these false promises, Malley siphoned the

assets of the MG Funds by making improper payments and distributions to related entities he

controlled, while hiding huge losses from investors with falsified financial reports.

4.      All told, Defendants raised approximately $58 million from investors for the MG

Funds, much of it from investors' retirement savings, and Defendants and the Relief Defendants

Malley controlled walked away with more than $7 million in misappropriated investor funds.

**VIOLATIONS**

5.      By virtue of the foregoing conduct and as alleged further herein, Defendants Malley

and MG Capital have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C.

§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

6.      Alternatively, Defendant Malley aided and abetted MG Capital's violations of Section

17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

7.      Alternatively, Defendant Malley is the control person of MG Capital and is jointly

and severally liable with MG Capital under Section 20(a) of the Exchange Act [15 U.S. Code § 78t]

for MG Capital's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

8.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rule this Complaint alleges they have violated; (b) ordering Defendants to disgorge on a joint and several basis all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) ordering Relief Defendants to pay, with prejudgment interest, on a joint and several basis with Defendant Malley, all ill-gotten gains by which they were unjustly enriched pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12.     Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Malley and MG Capital both may be found in, are inhabitants of, or transact business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including Defendants' fraudulent solicitation of investors, Defendants' banking transactions, and their purchases of real estate located in Manhattan.

## DEFENDANTS[1]

14.     **Malley**, age 50, is a resident of New York, NY and New Canaan, CT.  He is the sole owner of MG Capital and served as its CEO until he stepped down in or about December 2019.  Malley owns or controls the general partner of the MG Funds.  Malley also owns or controls MGC Realty and Malley Management Group Inc. ("MMG").  Malley organized, promoted, managed, and at all relevant times controlled the MG Funds, directly or through MG Capital.  He also served as the Chief Investment Officer ("CIO") of the MG Funds until his resignation from MG Capital.  Malley is a New York-licensed real estate broker who holds no securities licenses and has never been associated with any entity registered with the Commission.  When called to appear for testimony by the Commission staff, Malley declined to answer all substantive questions on Fifth Amendment grounds.

15.     **MG Capital** is a Delaware limited partnership formed on or about January 23, 2013.  It is headquartered in New York, NY.  MG Capital is not registered as an investment adviser or as a broker-dealer.  MG Capital, under the direct control of Malley, served as the organizer, promoter, and investment manager of the MG Funds.  At all relevant times, Malley was the sole owner as well

---

[1] Malley and the Commission staff entered into a series of tolling agreements covering the period October 1, 2019 through June 28, 2020, which provided that the running of any statute of limitations applicable to any action or proceeding against Malley brought by the Commission would be tolled and suspended for that period of time.

as the Managing Member or CEO of MG Capital.  While MG Capital employed between 3 and 13 people during the relevant period, Malley ran the most important areas of the business largely on his own.  Malley drafted (or personally directed the drafting of) all marketing materials, investor updates, and other communications with actual and prospective investors, and was the repository of all information concerning the performance of the MG Funds.  Malley was primarily or ultimately responsible for selecting investment properties, negotiating purchases, finding tenants and securing lease agreements, and engaging service providers, including the MG Funds' auditors, administrators, attorneys, and other professionals, and Malley was also responsible for providing those professionals with all necessary documents and information.  Malley had signatory authority over the MG Capital bank accounts.  Malley stepped down as CEO of MG Capital in or about December 2019, but retains 100% ownership of the now non-operational partnership.  Malley initially retained signatory authority over the MG Capital bank accounts following his resignation, but his authority was revoked in or around March 2020 after he attempted to withdraw funds from one of the accounts.

## RELIEF DEFENDANTS

16.     **MG GP III** is a Delaware limited partnership formed on or about January 23, 2013. It is headquartered in New York, NY.  MG GP III is the general partner of Fund III.  Malley directly or indirectly owns approximately 99% of MG GP III, and the remaining 1% is owned by certain former employees of MG Capital.  Malley controls MG GP III.

17.     **MGC Realty** is a Delaware limited liability company formed on or about August 30, 2016.  It is headquartered in New York, NY.  MGC Realty is a licensed real estate brokerage that received commissions and other fees for certain of the MG Funds' real estate acquisitions.  MGC Realty also served as the property manager for Fund IV.  Malley is the sole owner and Managing Member of MGC Realty.  Malley controls MGC Realty.

## OTHER RELEVANT ENTITIES

18.    **Fund III** is a Delaware limited partnership formed on or about January 23, 2013.  It is headquartered in New York, NY.  In addition to organizing, promoting and controlling Fund III as described above, Malley also owns approximately 5% of Fund III through MG GP III and other related entities.  Fund III is being wound-down under the supervision of an independent consultant retained as the general partner representative by MG Capital following Malley's resignation in December 2019, with the assistance of an investor committee.

19.    **Fund IV** is a Delaware limited partnership formed on or about February 9, 2017.  It is headquartered in New York, NY.  In addition to organizing, promoting and controlling Fund IV as described above, Malley owns approximately 1% of Fund IV through MG GP IV and other related entities.  Like Fund III, Fund IV is being wound-down by the same independent consultant as the general partner representative with the assistance of an investor committee.

20.    **MG GP IV LP** is a Delaware limited partnership formed on or about February 9, 2017.  It is headquartered in New York, NY.  MG GP IV is the general partner of Fund IV.  Malley directly or indirectly owns 100% of MG GP IV LP.

21.    **MMG** is a New York corporation formed on or about August 5, 2008.  MMG is headquartered in New York, NY.  MMG served as the property manager for Fund III.  Malley is the sole owner and President of MMG.

## FACTS

**I.    Malley Launches his First Fund and Fraudulently Solicits Investments**

22.    In February 2014, Malley launched Fund III with a set of marketing materials that

Defendants distributed to targeted investors, primarily high net worth individuals, family offices[2] and certain institutional investors.

23.     These marketing materials included an Investment Profile, Investor Presentation, and Frequently Asked Questions (collectively, the "Fund III Marketing Materials").

24.     If a potential investor expressed interest in Fund III, Defendants would send that potential investor offering documents consisting of a Private Placement Memorandum (PPM), a Limited Partnership Agreement , and a Subscription Agreement (collectively, the "Fund III Offering Documents").

25.     The Fund III Marketing Materials and Offering Documents were either personally drafted by Malley or were drafted under his direction and review.

26.     According to the Fund III Marketing Materials and Offering Documents, Fund III's strategy involved purchasing hundreds of luxury apartments in Manhattan at below-market prices and leasing them to corporate tenants.

27.     According to the Fund III Marketing Materials and Offering Documents, the investors in Fund III would receive annual distributions of the net rental income that the fund received from leasing such apartments.  In addition, after four years, Fund III would sell the entire investment portfolio to an institutional investor (the "strategic exit"), which would also serve as a method by which the investors would achieve a return on their investment.

28.     In exchange for its services, MG Capital would receive an annual management fee equal to 1% or 2% of invested capital (the "Management Fee"), and the general partner MG GP III would be entitled to between 10% and 20% of the fund's profits.  Another affiliated entity, MMG,

---

[2] Family offices are private wealth management firms that serve ultra-high-net-worth investors and typically offer a broader range of services to such investors than traditional advisory firms, including budgeting, insurance, charitable giving, and tax services, in addition to investment advice.

would serve as the property manager, and would receive 5% of gross rental income each year.

29.     According to the Fund III Marketing Materials, the targeted capital raise for Fund III was $525 million.

30.     Despite its name, Fund III was actually the first investment fund managed by Malley or MG Capital.  Prior to launching Fund III, Malley had been a real estate broker and a property manager.  He had no experience raising capital or managing an investment portfolio.

31.     Throughout the Fund III Marketing Materials and Offering Documents, Defendants falsely represented that they had managed two successful prior funds, "Fund I" and "Fund II."  The purpose of these misrepresentations was to convince potential investors that Defendants had the experience to successfully run Fund III and should be entrusted with the investors' investment capital.  Fund I and Fund II, however, were entirely fictitious.

32.     The Fund III Investment Profile and PPM included fraudulent performance metrics for the non-existent earlier funds.  With respect to the fictitious Fund I, Defendants falsely represented that Fund I:  (1) raised $350 million of investor capital; (2) earned a gross return on investment (ROI) of 38.99% and a net ROI of 30.81% during its six-year investment term from 2007 through 2013; (3) outperformed the S&P 500 Index by 4.5-to-1; and (4) sold its 74-property portfolio to two buyers for $750 million.

33.     Likewise, with respect to the fictitious Fund II, the Fund III Investment Profile and PPM falsely claimed that Fund II:  (1) raised $55 million of investor capital in only 30 days; and (2) achieved an average gross ROI of 38.06%, cumulative unrealized gains on equity of 154.55%, and a gross investment multiple of 2.55x, outperforming the S&P 500 Index by more than 2-to-1 during the period from 2011 to 2014.

34.     Malley (and MG Capital through Malley) knew that the representations concerning Fund I and Fund II and their performance were false.

35.     Notwithstanding the announced $525 million target, Defendants were only able to raise $23 million in Fund III from approximately 60 investors.

36.     While Defendants' claimed investment strategy was to purchase hundreds of luxury apartments in Manhattan, Fund III acquired a total of 9 residential units (and also held an option on an additional apartment that was never exercised).

37.     According to Fund III's audited financial statements, from the February 2014 launch through December 31, 2018, Fund III suffered net operating losses of approximately $860,000.

38.     Since inception, Fund III paid $1.4 million in management fees to MG Capital and $288,000 in property management fees to MMG.

39.     The Fund III investors never received any rent distributions.

40.     Between 2015 and 2017, Defendants distributed a total of $278,000 to MG GP III.

41.     The distributions to MG GP III violated the terms contained in the Fund III Offering Documents, which provided that rent distributions were only to be made based on net rental income.  Because Fund III had consistent negative net income, no distributions should have be made to any of the partners.  And the general partner of the fund should not have taken a distribution when no such distributions were made to the investors.

42.     Fund III's auditors challenged the distributions to MG GP III in connection with both the 2016 and 2017 audits of the fund.  Notwithstanding the auditors' disagreement with the distributions, MG GP III kept the money and was unjustly enriched thereby.

43.     The strategic exit that was supposed to take place in early 2018 never happened. Instead, the investment term was extended through December 2019, when Fund III went into wind-down, as discussed further below.

II.     **Malley Launches his Second Fund with Additional Fraudulent Representations**

44.     Malley launched a second fund – Fund IV – in September 2017.

45.     Fund IV had the same basic investment strategy as Fund III.

46.     While Fund III was targeted to high net worth individuals, family offices and institutional investors, Fund IV was marketed to a more inclusive group of investors.

47.     MG Capital publicly offered investments in Fund IV pursuant to Rule 506(c) under Regulation D.[3]

48.     Fund IV had a targeted capital raise of $250 million over a two-year period and a total investment term of six years.

49.     Under the terms applicable to most investors in Fund IV, MG Capital was entitled to a 4% annual Management Fee, and the general partner MG GP IV was entitled to 5% of net rental proceeds and 5% of residual profits.  MGC Realty, as the property manager, would be paid an annual fee equal to 5% of gross rental income.

50.     To expand its marketing reach, in or around August 2017, MG Capital retained a popular web-based crowdfunding platform to help find investors (the "Crowdfunding Platform").

51.     The Crowdfunding Platform agreed to publish on its website the Fund IV marketing materials – which included the Investment Profile, One-Pager, Investor FAQs, and Principal Protection Memo (collectively, the "Fund IV Marketing Materials") – effectively distributing them to its entire subscriber base.  Investors deemed accredited who expressed interest in Fund IV would

---

[3] Rule 506(c) permits issuers to broadly solicit and generally advertise an offering, provided that all purchasers in the offering are accredited investors, the issuer takes reasonable steps to verify purchasers' accredited investor status, and certain other conditions in Regulation D are satisfied.  A company is required to file a notice with the Commission on Form D within 15 days after the first sale of securities in the offering.  In May 2017, Defendants filed a Form D providing notice of an exempt offering of limited partnership interests (shares) in Fund IV.  In May 2018, Defendants filed a Form D/A stating that the first sale occurred in September 2017 and that $48,983,102 in Fund IV shares had been sold to 178 investors.  In fact, as of that date, Defendants had sold less than half that amount (only $22.7 million in Fund IV shares).  A second Form D/A filed in May 2019 correctly reported that 233 investors had purchased $32,186,777 in Fund IV shares, but offered no explanation for the earlier false statement.

then receive the offering documents directly from MG Capital, consisting of a Private Placement Memorandum (the "Fund IV PPM"), Limited Partnership Agreement, and a Subscription Agreement (collectively, the "Fund IV Offering Documents").

52.     Consistent with its terms of service, the Crowdfunding Platform was not involved in drafting and did not fact-check the Fund IV Marketing Materials or Offering Documents, which pursuant to agreement were entirely the responsibility of Malley and MG Capital.

53.     The Fund IV Marketing Materials and Offering Documents were either drafted personally by Malley or under his direction and supervision.

54.     The Fund IV Investment Profile and PPM (like those for Fund III) included false performance metrics for the fictitious Funds I and II.  With respect to the fictitious Fund I, the representations were similar to those made in the Fund III Marketing Materials and Offering Documents, described above in Paragraph 32.

55.     With respect to the fictitious Fund II, Defendants made the following false representations:  (1) that Fund II was in existence from 2011 through 2016; (2) that Fund II had a 19 property portfolio valued at $169.9 million, representing gross unrealized gains of 208.92% and a gross equity multiple of 3.09x; (3) that Fund II had annualized gross unrealized gains on equity of 25.3%; (4) that Fund II's total annual gross ROI (income plus unrealized gain) was 37.91%; (5) that Fund II made a cash distribution in 2016 of 12.8%; and (6) that Fund II outperformed the S&P 500 six year average by 2.93x.

56.     The Fund IV Marketing Materials also included additional false statements premised in whole or in part on the existence of Funds I and II, including that the total value of MG Capital's prior portfolios was $1.18 billion, that it had executed more than 400 real estate transactions, and that its 10-year returns had outperformed the S&P 500 Index by 4-to-1.

57.     The Fund IV Marketing Materials and the Fund IV PPM also included inflated performance data for Fund III, making no mention of Fund III's substantial operating losses, its failure to make any rental income distributions to investors, or its inability to raise even 5% of its targeted capital raise of $525 million.

58.     The Fund IV Marketing Materials and Offering Documents also falsely stated that MG Capital had partnerships with "more than 215 long-term corporate tenants" who had "non-cancelable, multi-year lease agreement[s] with built-in rent escalations."

59.     The Marketing Materials and Offering Documents also represented that all MG Capital-managed funds were "debt-free" and that they had generated income "from hundreds of individual portfolio properties across 100+ premier buildings."  In fact, Fund III – the only prior fund managed by MG Capital – had acquired only nine properties, two of which were encumbered by mortgages.

60.     Finally, the Marketing Materials and Offering Documents stated that "MG Capital targets a 20% gross annual IRR [internal rate of return] on investments and a gross investment multiple of 2.6x."  In light of the performance of Fund III, Defendants had no reasonable basis to support these performance targets.

61.     In their early marketing efforts for Fund IV, Defendants represented both in the Fund IV Marketing Materials and in direct communications with investors, that "investors' net invested capital is 100% protected from loss" or "fully protected from loss."  The Fund IV Marketing Materials further claimed that "[t]he General Partner of the Fund maintains a balance sheet in excess of $250M that could be drawn upon in the unlikely event that an investor's net invested capital commitment was not returned in full at the conclusion of the investment term."

62.     Fund IV's general partner MG GP IV, in fact, held no assets, and its only source of income was its 5% share of Fund IV distributions.

63.    Defendants only removed these specific representations concerning capital protection and the general partner's balance sheet from the Fund IV Marketing Materials after they raised $3.3 million in capital from investors.

64.    The Defendants repeated the misstatements contained in Paragraphs 54 through 61 above in webinars, public speaking engagements, and in at least hundreds of direct communications with prospective investors.  As examples:

a.    The slides for a December 7, 2017 MG Capital webinar hosted by Malley provide that MG Capital has "a proven track record", including a "10-year investment performance" that exceeded S&P 500 returns, "20+ years of deep investment expertise", and "consistent year-over-year growth for investors since 2000."  MG Capital, of course, was only formed in 2013 and its only investment fund – Fund III – had sustained large operating losses.  The slides also included inflated performance results for Fund III and fabricated performance results for the fictitious Funds I and II.

b.    On September 19, 2017, MG Capital sent an email responding to a potential investor's questions relating to the exit strategy for Fund IV as well as the guarantee of investor capital.  In the email, MG Capital stated "[h]istorically, this exit strategy has resulted in well-timed liquidity events for our direct global investors."  In fact, as of that date, Fund III had never implemented its exit strategy as Funds I and II did not exist.  The September 19, 2017 email also falsely represented that all of the funds' portfolio properties were free from mortgages, that MG Capital had "[s]trong cash flow from more than 215 high-quality, long term corporate tenant partnerships with non-cancelable, multi-year lease agreements that include built-in rent escalations ranging from 4-10% per annum" and that the general partner of the fund maintained

13

a balance sheet in excess of $250 million "that could be drawn upon in the unlikely event that an investor's net invested capital commitment was not returned in full at the conclusion of the investment term."  Defendants made similar false or misleading statements in emails with numerous other investors and potential investors in Fund IV.

65.    Malley (and MG Capital through Malley) knew that these representations were false or misleading.

66.    Despite targets of $250 million in invested capital and 2,200 portfolio properties, Fund IV only raised $35 million.  Fund IV purchased a total of eight apartments.

67.    Fund IV financial records show that, from the September 26, 2017 launch through December 31, 2019, Fund IV earned $1.6 million in rent and incurred operating expenses of $8.3 million, resulting in net operating losses of approximately $6.7 million.

68.    Financial records also reflect $4.7 million in unrealized losses on portfolio investments, bringing Fund IV's total net loss to approximately $11.4 million.

69.    The Defendants did not disclose to investors the losses incurred by Fund IV until November 2019, more than two years into Fund IV's term, when they distributed the first set of unaudited financial statements for the fund.

70.    Moreover, while Fund IV was still accepting new investments, the Defendants released a steady stream of false or misleading information through a series of Investor Memos that were distributed soon after each quarter-end to Fund IV investors, and posted on MG Capital's website, where they also could be viewed by prospective investors.

71.    In the quarterly Investor Memos, the Defendants reported vastly inflated "market values" for portfolio properties.

72.     For example, the Investor Memo for Q4 2018, released in or around January 2019, stated "Throughout 2018, Fund IV acquired… luxury residential real estate with an estimated market value of $34.6 million, representing a 41.1% discount to market value."  Contemporaneous fund financial records reflected a valuation of $24.3 million as of December 31, 2018, the last day of the fund's fourth quarter.

73.     Similarly, the Investor Memos for Q1, Q2, and Q3 2018 reported "market values" for properties that were inflated or otherwise not supported by internal financial records.

74.     The Investor Memos also contained misstatements concerning Fund IV's rental income.  For example, the Q3 2018 Investor Memo reported that "each year the Fund will generate further rental income growth attributable to the annual rent escalations that are included within all of the portfolio property leases and range from 4-10% per annum."  In fact, however, none of the five properties owned by Fund IV as of Q3 2018 had a lease with an annual rent escalation.

75.     Several of the Investor Memos claimed that the "anticipated [annual] gross recurring rent roll" for certain properties was above 7% of the acquisition cost.  In fact, those properties were leased at much lower rates.

76.     Defendants knew that these representations were false or misleading.

### III.     Defendants Misappropriated More than $7 Million of Investor Funds

77.     In addition to the $278,000 that Defendants wrongfully distributed to MG GP III (described above in Paragraph 40), the Defendants siphoned more than $7 million for themselves and Relief Defendant MGC Realty by (i) improperly retaining cash rebates received from the sellers of the apartments purchased by the MG Funds, and (ii) charging the MG Funds unearned transaction fees in connection with certain of the MG Funds' real estate acquisitions.  Defendants then concealed their misappropriation by submitting false invoices and reporting inflated purchase prices to the funds' administrator and to investors.

78.     First, in eight instances (covering both Fund III and Fund IV), the Defendants fraudulently diverted to MG Capital a total of $4,785,776.00 in "seller's concessions," or pre-negotiated purchase price adjustments that were paid by the sellers at acquisition closings.  Instead of directing those amounts back to the MG Funds (as the purchasers of the properties), MG Capital simply kept the concessions for itself and did not disclose them to the funds' administrator or to the investors, in each case reporting the higher pre-concession price as the purchase price of the property.  The following chart details those transactions:

| FUND | CLOSING DATE | PROPERTY REF # | CONCESSION |
|------|--------------|----------------|------------|
| Fund III | 10/23/14 | 3 | $20,000 |
| Fund III | 6/27/17 | 8 | $360,000 |
| Fund III | 6/27/17 | 9 | $360,000 |
| Fund IV | 1/5/18 | 10 | $1,856,730 |
| Fund IV | 1/25/18 | 11 | $1,464,038 |
| Fund IV | 12/28/18 | 15 | $200,000 |
| Fund IV | 2/27/19 | 16 | $250,000 |
| Fund IV | 8/20/19 | 17 | $275,000 |
| TOTAL | | | $4,785,776 |

79.     Second, Defendants directed the MG Funds to pay more than $2 million in unearned transaction fees to MGC Realty.

80.     The Fund III and Fund IV Offering Documents permitted MGC Realty – either alone or in cooperation with a third-party real estate broker – to provide brokerage services in connection with property acquisitions "for which the Fund would otherwise retain a third-party service provider."

81.     Whether alone or in cooperation with another broker, MGC Realty would be entitled to a fee **no greater than 3%** of the purchase price for any transaction in which it provided such services.  If a third-party broker was also involved, that third-party broker would be entitled to its own 3% fee.  These fees are referred to as "Brokerage Fees" in the Fund III Offering Documents and as "Advisory Fees" in the Fund IV Offering Documents (collectively "Advisory Fees").

82.     MGC Realty collected Advisory Fees (brokerage fees) from the funds in connection with 13 of the 17 property acquisitions for Funds III and Fund IV.

83.     In 11 of the 13 cases, MGC Realty had already been paid its maximum 3% co-brokerage fee by the seller (via the listing broker), and therefore was not entitled to any additional Advisory Fee from the funds.

84.     Moreover, in each of the 13 transactions described above MGC Realty collected an **additional** 3% from the funds, ostensibly on behalf of third-party listing brokers.  To support the payments to the listing broker, Defendants submitted to the funds' administrator a copy of the listing broker's invoice for its 3% brokerage fee and directed the funds' administrator to wire to MGC Realty the fee purportedly owed to the third-party broker.  The listing brokers had already been paid by the sellers at closing, however, and this money was kept by MGC Realty.

85.     As demonstrated in the following chart, MGC Realty received a total of $2,184,450 million in unearned Advisory Fees ($675,000 from Fund III and $1,509,450 million from Fund IV).

| FUND | CLOSING DATE | PROPERTY REF # | UNEARNED ADVISORY FEE | ADDITIONAL UNEARNED ADVISORY FEE THAT PURPORTED TO GO TO A THIRD-PARTY BROKER |
|------|--------------|----------------|------------------------|-------------------------------------------------------------------------------|
| Fund III | 1/1/16 | 5 |  | $46,800 |
| Fund III | 9/8/16 | 6 | $82,500 | $82,500 |
| Fund III | 3/10/17 | 7 | $66,000 | $66,000 |
| Fund III | 6/27/17 | 8 | $72,000 | $93,600 |
| Fund III | 6/27/17 | 9 | $72,000 | $93,600 |
| Fund IV | 1/5/18 | 10 | $179,798 | $291,202 |
| Fund IV | 1/25/18 | 11 | $179,579 | $267,421 |
| Fund IV | 8/2/18 | 12 | $45,750 | $45,750 |
| Fund IV | 8/8/18 | 13 | $46,500 | $46,500 |
| Fund IV | 8/9/18 | 14 | $47,100 | $47,100 |
| Fund IV | 12/28/18 | 15 | $49,500 | $61,500 |
| Fund IV | 2/27/19 | 16 | $63,000 | $78,000 |
| Fund IV | 8/20/19 | 17 |  | $60,750 |
| TOTAL |  |  | $903,727 | $1,280,723 |

**IV.      Defendants' Fraudulent Scheme Unravels**

86.      In November 2018, the Commission issued a subpoena to MG Capital for the production of records concerning investments in the MG Funds.

87.      In June 2019, during the pendency of the audit of the MG Funds' financial statements for year-end 2018, the funds' auditor terminated its audit engagement, informing the funds that "the risk profile no longer meets [the auditor's] requirements.  As such, it would be irreparably prejudicial for [the auditor] to continue to provide the services delineated …."

88.      On November 6, 2019, Defendants distributed unaudited financial statements for Fund IV covering the period from inception through December 31, 2018.  The accompanying memo to investors also disclosed the Commission's investigation into MG Capital, and contained several false or misleading statements concerning the investigation.

89.      The November 6, 2019 memo to investors falsely or misleadingly attributed a substantial portion of the reported losses to "legal expenses [] incurred by the Fund in connection with a non-public inquiry conducted by the [SEC]."  The memo also falsely or misleadingly stated that "[s]ubject to the SEC's ability to revisit or reopen the matter, we do not anticipate further related expenses being incurred."  At that time, Defendants knew that several current and former MG Capital employees, including Malley, were scheduled to testify in the Commission's investigation in the coming weeks.

90.      In December 2019, Malley resigned as CEO of MG Capital and CIO of the MG Funds, and Funds III and IV went into wind-down.

91.      Each fund retained an independent consultant as its general partner representative and established an investor committee to oversee the wind-down.

92.      To date, the independent consultant has sold two properties from the Fund IV portfolio, using the proceeds to pay down a mortgage secured by one of the remaining properties,

which is currently in default.  While a few other properties from both funds are under contract, it appears unlikely that investors will recover more than a fraction of their investment.

### FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Malley and MG Capital)

93.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

94.     Defendants, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly have employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently have obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently have engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

95.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

### SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Malley and MG Capital)

96.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

97.     Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed

one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

98.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### In the Alternative, Aiding and Abetting Violations of Securities Act Section 17(a)
### (Malley)

99.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

100.     As alleged above, MG Capital violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

101.     Malley knowingly or recklessly provided substantial assistance to MG Capital with respect to its violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

102.     By reason of the foregoing, Malley is liable pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)] for aiding and abetting MG Capital's violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and, unless enjoined, Malley will again aid and abet these violations.

### FOURTH CLAIM FOR RELIEF
### In the Alternative, Aiding and Abetting Violations of Exchange
### Act Section 10(b) and Rule 10b-5
### (Malley)

103.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

104.     As alleged above, MG Capital violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

105.     Malley knowingly or recklessly provided substantial assistance to MG Capital with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

106.     By reason of the foregoing, Malley is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting MG Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and, unless enjoined, Malley will again aid and abet these violations.

### FIFTH CLAIM FOR RELIEF
**In the Alternative, Control Person Liability for Violations of**
**Exchange Act Section 10(b) and Rule 10b-5**
**(Malley)**

107.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

108.     As alleged above, MG Capital violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

109.     At all relevant times, Malley controlled MG Capital and was a culpable participant in MG Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

110.     By reason of the foregoing, Malley is liable as a controlling person pursuant to Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for MG Capital's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SIXTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(MG GP III and MGC Realty)**

111.     The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 92.

112.   MG GP III received approximately $278,000 in improper distributions of rental proceeds.

113.   MG GP III has no legitimate claim to these funds.

114.   MG GP III obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

115.   MG GP III has therefore been unjustly enriched.

116.   MGC Realty received approximately $2.2 million in unearned Advisory Fees.

117.   MGC Realty has no legitimate claim to these ill-gotten gains.

118.   MGC Realty obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

119.   MGC Realty has therefore been unjustly enriched.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Malley and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining MG Capital and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### III.

Ordering Defendants, on a joint and several basis, to disgorge all ill-gotten gains they received directly or indirectly with pre-judgment interest thereon, as a result of the alleged violations;

### IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### V.

Ordering MG GP III to pay, with prejudgment interest, along with Defendant Malley on a joint and several basis, all ill-gotten gains by which it was unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)];

### VI.

Ordering MGC Realty to pay, with prejudgment interest, along with Defendant Malley on a joint and several basis, all ill-gotten gains by which it was unjustly enriched, under Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; and

### VII.

Granting any other and further relief this Court may deem just and proper.

Dated:  New York, New York
        January 12, 2021

                              _____/s/ Richard R. Best_____
                              RICHARD R. BEST
                              REGIONAL DIRECTOR
                              Lara S. Mehraban
                              Celeste A. Chase
                              Todd D. Brody
                              Derek M. Schoenmann
                              Ibrahim Sajalieu Bah
                              Attorneys for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              New York Regional Office
                              Brookfield Place
                              200 Vesey Street, Suite 400
                              New York, New York 10281-1022
                              (212) 336-0080 (Brody)
                              brodyt@sec.gov